UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | |
|---|---|
| NEKI PEAVY as administrator of the ESTATE OF COREY KINDELL, and BILLY EUGENE KINDELL as surviving father of COREY KINDELL, | CIVIL ACTION FILE NO.____ |
| *Plaintiffs*, | **JURY TRIAL DEMANDED** |
| v. | |
| CORECIVIC, INC., CORECIVIC OF TENNESSEE, LLC, VANCE LAUGHLIN, QIANA MOBLEY, CHRISTY DAVIS, ANNIE REESE, VANESSA WISE, SHANIQUA WICKER, TASHIKA MCKINNON, and AMBERLYN FLOYD, | |
| *Defendants*. | |

## **COMPLAINT**

1.  On August 21, 2020, Corey Kindell died of acute COVID-19 infection at Wheeler Correctional Facility, a private prison owned and operated by Defendants CoreCivic, Inc. and CoreCivic of Tennessee, LLC.

2.  For the previous two weeks, Mr. Kindell was obviously very sick from COVID-19.

3.  Defendants knew that COVID-19 was infecting a large number of incarcerated men in Mr. Kindell's open and crowded dormitory.

4.  Mr. Kindell was so sick that he could not get out of bed to go outside for recreation or to stand in line to be counted by Defendants or to get food.

5. Mr. Kindell was obviously struggling to breathe, wheezing and coughing, and complaining about shortness of breath.

6. For over a week, Mr. Kindell and several other incarcerated men repeatedly asked Defendants for medical treatment.

7. Defendants acknowledged Mr. Kindell's infection with COVID-19.

8. Instead of providing treatment, Defendants told Mr. Kindell he had the "flu" and had to "tough it out."

9. Defendants made disparaging remarks about him, at one point stating that Mr. Kindell's "fat ass could get out of bed if there was a twinkie."

10. Defendants behaved this way in lieu of doing <u>anything</u> to help Kindell,

11. In fact, Defendants knew that Mr. Kindell had stopped eating and that he had become so weak he could not get out of bed.

12. On the afternoon of August 21, 2020, Mr. Kindell stopped breathing while in his dormitory.

13. Only at this point was Mr. Kindell transported to the medical unit to receive any care whatsoever; but it was too late.

14. The medical unit immediately called for an ambulance for transport to a hospital.

15. But Mr. Kindell died before he got into the ambulance.

16. Plaintiffs bring this action for Defendants' gross negligence and wanton conduct under state law and for deliberate indifference under federal law, for wrongful death and for the pain and suffering caused by failing to provide any care for weeks despite Kindell's obvious suffering.

## PARTIES

17. Neki Peavy is an adult resident citizen of the State of Georgia. She is one of Mr. Kindell's siblings and has been appointed administrator of the Estate of Corey DeShawn Kindell. See In re Estate of Corey DeShawn Kindell, Dekalb County Probate Court, Estate No. 2021-1157.

18. Billy Eugene Kindell is an adult resident citizen of the State of Georgia. He is Mr. Corey Kindell's father and next of kin.

19. Defendant CoreCivic, Inc. is a Tennessee foreign corporation, registered to do business in the State of Georgia, is subject to the jurisdiction of this Court, and may be served with process by and through its registered agent for service of process, Russell Clark, 4 West Railroad Ave, Alamo, GA, 30411.

20. Defendant CoreCivic of Tennessee, LLC is a Tennessee foreign corporation, registered to do business in the State of Georgia, is subject to the jurisdiction of this Court, and may be served with process by and through its registered agent for service of process, Russell Clark, 4 West Railroad Ave, Alamo, GA, 30411.

21. At all relevant times, Defendants CoreCivic, Inc. and CoreCivic of Tennessee, LLC (collectively "CoreCivic") acted under color of state law for purposes of 42 U.S.C. § 1983 under, e.g., the "public function test" as operators of a prison facility. Curtis v. CoreCivic, Inc., No. CV 321-015, 2021 WL 4227065, at *3 (S.D. Ga. Sept. 16, 2021).

22. At all relevant times, Defendant Vance Laughlin was the warden employed by CoreCivic assigned to run Wheeler Correctional Facility. He is sued in his individual capacity. At all times relevant to the complaint, Laughlin acted under the color of law.

23. At all relevant times, Defendant Qiana Mobley was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, Mobley acted under the color of law.

24. At all relevant times, Defendant Christy Davis was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, Davis acted under the color of law.

25. At all relevant times, Defendant Annie Reese was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, Reese acted under the color of law.

26. At all relevant times, Defendant Vanessa Wise was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, Wise acted under the color of law.

27. At all relevant times, Defendant Shaniqua Wicker was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, Wicker acted under the color of law.

28. At all relevant times, Defendant Tashika McKinnon was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, McKinnon acted under the color of law.

29. At all relevant times, Defendant Amberlyn Floyd was a prison officer employed by CoreCivic assigned to Mr. Kindell's dormitory. She is sued in her individual capacity. At all times relevant to the complaint, Floyd acted under the color of law.

## JURISDICTION AND VENUE

30. This action arises under the authority vested in this Court by virtue of 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343 (a)(3), the United States Constitution, and Georgia law.

31. This Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

32. Venue in this Court is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims arose in this district and division.

## FACTUAL BACKGROUND

*CoreCivic's COVID-19 Policies*

33. In response to the COVID-19 pandemic, as early as March and April of 2020, CoreCivic put in place written policies to combat the spread of the virus.

34. These policies mandated that staff identify and isolate COVID-19 positive incarcerated men, regularly test for the virus, separate the sick from the well, and notify staff and incarcerated men and local authorities of potential exposures.

35. More specifically, the policies provided that staff "shall" "[p]romptly identify and contain inmates with coronavirus-like symptoms;" "[i]solate or cohort inmates who are sick with pandemic coronavirus;" and "[c]onduct contact investigations for coronavirus cases and quarantine contacts."

36. CoreCivic was and is required to implement Georgia Department of Corrections policies regarding COVID-19.

37. These policies included mandatory placement of confirmed or suspected COVID-19 positive incarcerated men in isolation.

38. These policies were disregarded at Wheeler Correctional Facility.

39. While the written policies mandated identification and isolation, among other protective actions, the widespread practice at Wheeler Correctional Facility as of July and August 2020 was to lump sick and healthy inmates together, ensuring that all inmates would rapidly contract the virus.

40. Incarcerated men who were suspected of being COVID-19 positive were transferred into dormitories with healthy incarcerated men where the virus was assured to spread.

41. For example, in Mr. Kindell's dormitory, there were approximately 80 men in a single room with rows of bunkbeds.

42. Prior to Mr. Kindell contracting COVID-19, other incarcerated men in his open dormitory were obviously displaying the hallmark signs of COVID-19, including fever, coughing, and shortness of breath, but they were not isolated.

43. When Mr. Kindell contracted COVID-19, he was not isolated, despite showing hallmark symptoms that conspicuously worsened over two weeks.

44. Another policy required staff to identify and isolate incarcerated men at a high risk of special susceptibility to COVID-19 before exposure to COVID-19.

45. Mr. Kindell was obviously at a high risk of special susceptibility to COVID-19 due to his significant obesity and diagnosed hypertension.

46. The CDC lists obesity and hypertension as conditions which place individuals at risk of susceptibility and more dangerous reactions to COVID-19.

47. Mr. Kindell was not isolated in any fashion, and was instead maintained in an open dormitory with approximately 80 men.

48. CoreCivic's written materials provided that anyone experiencing symptoms consistent with COVID-19, such as coughing, fever, or shortness of breath, would receive the highest priority medical treatment—whether the symptoms were self-reported or observed by other incarcerated men or by CoreCivic staff.

49. When incarcerated men displaying such symptoms, including Mr. Kindell, asked for protection or treatment, they were told by Defendants that COVID-19 was "like the flu" and they had to "let it run through you."

50. Similarly, Warden Laughlin visited Mr. Kindell's dorm knowing that Kindell and others were sick. Laughlin told the incarcerated men that he knew they were suffering and that they could ask for over the counter pain medicine.

51. When incarcerated men, including Mr. Kindell asked for medical care, they were told that they could buy cough syrup from the prison store, but that nothing else would be done.

52. Mr. Kindell, like other incarcerated men in his position, received no medical attention whatsoever despite obviously meeting the criteria for high priority treatment.

53. CoreCivic's written materials provided for a quarantine period for any incarcerated person returning from an off-site visit.

54. Instead, persons returning from, e.g., off site medical appointments, were immediately placed back into their previous placements, allowing the virus to freely spread.

55. Defendants' practice was to disregard the written materials mandating a quarantine period for any incarcerated person returning from an off-site visit; instead, bringing these persons into the population immediately upon their return.

56. Another Georgia Department of Corrections policy mandated that any suspected COVID-19 positive incarcerated person be tested for COVID-19.

57. Despite displaying obvious signs of COVID-19 for weeks, Mr. Kindell was never tested.

58. Similarly, other incarcerated men at Wheeler Correctional Facility who displayed COVID-19 symptoms were not tested.

59. CoreCivic's policy was to have Wheeler Correctional Facility fully staffed.

60. But throughout 2020, including in July and August, Wheeler Correctional with half of the minimal required staff.

61. Throughout 2020, including in July and August, the dorm to which Mr. Kindell was assigned frequently operated with one third of the minimal required staff.

62. CoreCivic's written policies were not followed at the Wheeler Correctional Facility.

63. As of July and August 2020, CoreCivic's practice was to disregard entirely any written policies and any efforts to isolate the sick from the well.

64. Instead of adhering to CoreCivic's written policies regarding COVID-19, the widespread practice was to freely allow the spread of COVID-19 through the population at Wheeler Correctional Facility.

65. As of September 2020, CoreCivic's practice of allowing all incarcerated men at Wheeler Correctional Facility to contract COVID-19 was widespread and devastatingly effective.

66. As of September 2020, CoreCivic operated prisons at Wheeler Correctional Facility and Coffee Correctional Facility each had far more COVID-19 cases than any other prison in the Georgia Department of Corrections system.

67. Each of the named Individual Defendants wholly ignored CoreCivic's written coronavirus policies, including the requirement to isolate the sick from the well and to provide medical attention to suspected COVID-19 patients.

68. The Individual Defendants' disregard was part of a widespread practice by CoreCivic at Wheeler Correctional Facility and elsewhere.

69. As a result of these practices, Corey Kindell contracted COVID-19.

***Mr. Kindell Wholly Ignored Until He Died***

70. For weeks prior to his death, it was obvious to anyone that Mr. Kindell had symptoms consistent with COVID-19, including fever, cough, and shortness of breath.

71. Mr. Kindell was visibly sweating from the fever in a way that was not typical for him.

72. Mr. Kindell's condition continuously deteriorated.

73. Mr. Kindell eventually could not get out of bed.

74. Multiple times per day, all incarcerated men in Mr. Kindell's open dormitory were required to stand in formation to be counted by staff.

75. For over a week, Mr. Kindell was so weak and short of breath that he could not get out of his bed.

76. All of the Individual Defendants knew this because they observed that Mr. Kindell was present but not in formation for count.

77. All Individual Defendants excused Mr. Kindell from standing in formation for count because they knew he was too sick to stand, despite their verbal abuse of him.

78. Mr. Kindell was also too sick to go outside during the designated periods.

79. On multiple occasions, the Individual Defendants observed other men in his open dormitory carrying Mr. Kindell outdoors so that he could get fresh air.

80. Mr. Kindell repeatedly reported that he was seriously ill to the Individual Defendants and begged for medical attention.

81. Other men in his dormitory reported that Mr. Kindell was seriously ill to the Individual Defendants and begged for medical attention.

82. For days, Mr. Kindell and other men reported to the Individual Defendants that Mr. Kindell was not able to breathe properly.

83. For days, Mr. Kindell was audibly wheezing such that the Individual Defendants readily observed his labored breathing.

84. The Individual Defendants knew that Mr. Kindell had stopped eating.

85. For days, Mr. Kindell and other men reported to the Individual Defendants that they did not think Kindell would "make it."

86. Mr. Kindell received no medical attention or care whatsoever.

87. The Individual Defendants knew that Mr. Kindell was particularly vulnerable to COVID-19 because of his significant obesity and his diagnosed hypertension.

88. The Individual Defendants knew that Mr. Kindell was particularly sick because he had COVID-19 symptoms and was so weak that he could not get out of bed and was repeatedly begging for medical attention and reported that he could not breathe.

89. Instead of taking any action whatsoever, the Individual Defendants did nothing.

90. Qiana Mobley knew Mr. Kindell was very sick so that he could not stand up, but instead of providing any care whatsoever, she disparaged Kindell, stating that he was a "fat ass" and would be able to stand up if he might get a "twinkie."

91. All Individual Defendants knew that Mr. Kindell was suffering the effects of a serious COVID-19 infection.

92. Individual Defendants knew this because they were assigned to supervise him and others in his dorm for entire days, multiple periods of time in the weeks leading up to his demise.

93. On August 21, 2020, Mr. Kindell became unresponsive in his dormitory.

94. Other men brought this to the attention of staff, who for the first time arranged for Mr. Kindell's transport to medical.

95. Mr. Kindell was transported to medical, for the first time, via wheelchair in the mid-afternoon on August 21, 2020.

96. Staff called for transport to an outside hospital when Mr. Kindell could not move from the wheelchair to the bed in the medical unit.

97. Mr. Kindell died before he got into the ambulance for transport.

98. Plaintiffs allege that Mr. Kindell would not have contracted COVID-19 but-for the gross negligence, willful and wanton misconduct, and reckless infliction of harm by Defendants.

99. Plaintiffs further allege that Kindell needlessly suffered for two weeks without any medical attention or transport as a result of Defendants' deliberate indifference, gross negligence, willful and wanton misconduct, and reckless infliction of harm.

100. Plaintiffs further allege that Mr. Kindell would have survived had he not been subjected to Defendants' deliberate indifference, gross negligence, willful and wanton misconduct, and reckless infliction of harm.

101. Plaintiffs' claims are not premised on the administration or use of any covered countermeasure as defined in 42 U.S.C. § 247-6d.

## CLAIMS FOR RELIEF

### Count I
### *Deliberate Indifference*
### *Under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments*
### *Against the Individual Defendants*

102. The Individual Defendants were each assigned to Mr. Kindell's dormitory in the weeks leading to his death.

103. Each of the Individual Defendants knew Mr. Kindell had COVID-19 based on his weeks' long fever, cough, and shortness of breath.

104. Each of the Individual Defendants knew Mr. Kindell was especially likely to experience dangerous complications from COVID-19 based on his significant obesity and other health problems.

105. Each of the Individual Defendants knew Mr. Kindell had deteriorated to the point that he could not stand.

106. Each of the Individual Defendants knew that Mr. Kindell and other men had complained that Kindell was having significant difficulty breathing.

107. Each of the Individual Defendants knew that Mr. Kindell and other men has asked that he be helped and that he be seen at medical.

108. As a result of this subjective knowledge, each of the Individual Defendants knew that Mr. Kindell was facing a risk of serious harm including death.

109. In response to the subjective knowledge of the serious risk facing Mr. Kindell, the Individual Defendants did nothing whatsoever to help Mr. Kindell.

110. Each of the Individual Defendants knowingly disregarded the policies outlined above.

111. Based on the knowledge and severity of the risk and the absence of any action to mitigate the risk, the Individual Defendants' conduct went far beyond mere negligence.

112. Because the Individual Defendants' conduct violated the Eighth Amendment based on deliberate indifference, the Individual Defendants are not entitled to qualified immunity.

113. Because the Individual Defendants' conduct involved reckless and callous indifference to Mr. Kindell's rights to minimally adequate medical care, the Individual Defendants are liable for punitive damages.

**Count II**
*Deliberate Indifference*
*Under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments*
*Against CoreCivic*

114. CoreCivic knew that COVID-`9 represented a serious risk of harm and potential death to the incarcerated men and women in its custody.

115. As a result, CoreCivic developed a series of policies for dealing with COVID-19, as described above.

116. CoreCivic's demonstrated widespread and wholesale departure from these policies at Wheeler Correctional Facility indicate nonetheless that these policies were for show.

117. CoreCivic's real policy, as exemplified by the widespread and wholesale departure from the written policies outlined above, was to

    a. fail to take appropriate measures to ensure minimally adequate staffing,

    b. fail to take any measures to ensure staff compliance with written policies,

    c. do nothing to quarantine inmates coming into the facility,

    d. do nothing to separate the sick from healthy,

    e. do nothing to separate and isolate the most medically vulnerable,

      f.  do nothing to test suspected COVID-19 positive men,

      g.  do nothing to help obviously sick men, and

      h.  do nothing to treat or transport men who were sick enough to die.

118. CoreCivic subjectively knew of the serious risks facing men like Mr. Kindell who were exposed to COVID-19, but CoreCivic did nothing whatsoever to help Mr. Kindell and men like him.

119. CoreCivic knew that policies outlined above were being ignored on a systematic basis at Wheeler Correctional Facility and at other CoreCivic facilities, but did nothing to correct the widespread and wholesale departure from policy.

120. In Georgia and in Tennessee, CoreCivic prisons were responsible for significantly disproportionate numbers of COVID-19 cases and deaths compared to the prison system at large.

121. In Georgia, health officials blamed CoreCivic's handling of Wheeler Correctional Facility for causing a COVID-19 outbreak throughout southeast Georgia.

122. As of the last available information, shortly after Mr. Kindell's death, Wheeler Correctional Facility had twice as many COVID-19 deaths as any other prison in Georgia.

123. At that time, Wheeler Correctional Facility was responsible for a greatly disproportionate number of COVID-19 deaths. Approximately 15% of the COVID-19 deaths of incarcerated persons in Georgia occurred at Wheeler Correctional Facility, despite housing a much smaller proportion of the incarcerated population in the state.

124. Based on the severity of the risk and the absence of any action to mitigate the risk, CoreCivic's conduct went far beyond mere negligence.

125. CoreCivic is not entitled to qualified or other immunities.

126. Because CoreCivic's conduct involved reckless and callous indifference to Mr. Kindell's rights to minimally adequate medical care, CoreCivic is liable for punitive damages.

### Count III
***Gross Negligence, Willful or Wanton Misconduct, Reckless or Intentional Infliction of Harm
Under O.C.G.A. §§ 51-1-13 and 51-16-2, et seq.
Against All Defendants***

127. Defendants were under various duties, as outlined above, to take reasonable precautions to protect Mr. Kindell from foreseeable harm, including contracting and succumbing to COVID-19.

128. Defendants breached those duties by engaging in conduct that went beyond mere negligence and amounted to gross negligence, willful and wanton misconduct, and reckless and intentional infliction of harm.

129. Mr. Kindell and Plaintiffs were injured as a result of Defendants' breaches of their duties.

130. Defendants' breaches of their duties proximately caused Mr. Kindell's injuries and Plaintiffs' injuries.

131. Because Defendants' conduct went beyond mere negligence and amounted to gross negligence, willful and wanton misconduct, and reckless and intentional infliction of harm, Defendants are not afforded any immunity under O.C.G.A. § 51-16-1 et seq.

132. Because Defendants' conduct amounted to willful misconduct, malice, fraud, wantonness, oppression, and the entire want of care which would raise the presumption of conscious indifference, Defendants are liable for punitive damages.

### Count IV
***Attorneys' Fees
Under O.C.G.A. § 13-6-11
Against All Defendants***

133. Defendants have also acted in bad faith, been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense, such that Plaintiffs are entitled to an award of attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## REQUEST FOR RELIEF

WHEREFORE, on the basis of the foregoing, Plaintiffs respectfully pray that this Court:

a) Assume jurisdiction over this action;

b) Hold a trial by jury on all issues so triable;

c) Award general and special compensatory damages to Plaintiffs in an amount determined by the enlightened conscience of fair and impartial jurors;

d) Award reasonable attorney's fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988, O.C.G.A. § 13-6-11, and other applicable law;

e) Award punitive damages; and

f) Award such other and further relief as this Court deems just and proper.

Respectfully submitted this 22nd day of August, 2022.

/s/ Amith Gupta
Amith Gupta, Esq.
Admission to Appear PHV Pending
GA Bar. No. 149222
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
(408) 355-5782
amithrgupta+law@gmail.com
*Lead Counsel*

/s/ Zack Greenamyre
Zack Greenamyre
GA Bar No. 293002
MITCHELL & SHAPIRO LLP

3490 Piedmont Road, Suite 650
Atlanta, GA 30305
(404) 812-4747
(404) 812-4740 (fax)
zack@mitchellshapiro.com
*Local Counsel*