IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

```
NEKI PEAVY, as administrator of    *
the Estate of Corey Kindell,       *
and BILLY EUGENE KINDELL, as       *
surviving father of Corey          *
Kindell,                           *
                                   *
        Plaintiffs,                *
                                   *
        v.                         *    CV  322-095
                                   *
QIANA MOBLEY; CHRISTY DAVIS;       *
VANESSA WISE; SHANIQUA WICKER;     *
TASHIKA MCKINNON; and AMBERLYN     *
FLOYD,                             *
                                   *
        Defendants.                *
```

**O R D E R**

Presently before the Court is a motion for summary judgment filed by five of the six remaining defendants in the case, all correctional officers employed at the Wheeler Correctional Facility at the time that Inmate Corey Kindell fatally succumbed to COVID-19.[1]  Plaintiff Neki Peavy filed this lawsuit as the administrator of Mr. Kindell's estate and is joined by Plaintiff

---

[1] On October 27, 2023, defense counsel filed a Suggestion of Bankruptcy as to the sixth Defendant, Officer Tashika McKinnon, suggesting that the case is stayed as against her. See Doc. No. 35 (citing 11 U.S.C. § 362).  Officer McKinnon's Chapter 7 bankruptcy case remains open – In re Tashika S. McKinnon, Case No. 22-30005 (S.D. Ga. Jan. 14, 2022).  Defendant McKinnon is not joined in the motion for summary judgment.

Billy Eugene Kindell, Mr. Kindell's father and next of kin. Upon review of the parties' briefs, the record evidence, and the applicable law, Defendants' motion for summary judgment is **GRANTED** for the reasons stated below.

## I.  FACTUAL BACKGROUND

In viewing the evidence in the light most favorable to Plaintiffs, the relevant facts in the case are as follows.

Inmate Corey Kindell was assigned to the 8M-4 dormitory at Wheeler Correctional Facility ("WCF") on May 2, 2019, which is one of several open dormitories that housed approximately 80 to 90 inmates inside of the 800 Unit.  Mr. Kindell was housed in this dormitory until his death on August 21, 2020.  (Pls.' Resp. to Defs.' St. of Material Facts, Doc. No. 53, ¶¶ 4 & 5.)

The Defendant Correctional Officers worked at WCF in the weeks before Mr. Kindell died.  (Id. ¶ 6.)  Officers Vanessa Wise, Qiana Mobley, and Christy Davis worked in the 800 Unit on the day shift, while Officer Amberlyn Floyd worked on the night shift.  (Id. ¶ 7.) Officer Shaniqua Wicker only worked in Mr. Kindell's dormitory on August 7th and 8th on the night shift, thirteen days before he died.  (Id. ¶ 8.)

As correctional officers, Defendants' duties included monitoring the dormitories and ensuring the safety and security of the dormitories.  (Id. ¶ 9.)  They also performed regular counts during their shifts to account for all the inmates in each

2

dormitory.  (Id. ¶ 10.)  During some of the counts, inmates were expected to stand up.  (Id. ¶ 11.)  In fact, failure to stand during "standing counts" was considered a rule violation.  (Dep. of Qiana Mobley, Doc. No. 53-8, at 26; Dep. of Vanessa Wise, Doc. No. 53-9, at 22-26; see Dep. of Shaniqua Wicker, Dep. No. 53-5, at 22.)  Three of the Defendant Officers testified that failure to stand, however, did not necessarily signal that an inmate was sick or infirm.  (Dep. of Christy Davis, Doc. No. 53-4, at 25; Mobley Dep. at 25-27; Wise Dep. at 23.)  Another Defendant Officer, Officer Amberlyn Floyd, testified that if an inmate "wasn't able to stand" for count, it would indicate that "something was wrong." (Dep. of Amberlyn Floyd, Doc. No. 53-7, at 25.)  None of the Defendant Officers recalled Mr. Kindell being unable to stand when required.  (Mobley Dep. at 28; Davis Dep. at 27; Wicker Dep. at 22-23; Wise Dep. at 28[2].)  Three of Mr. Kindell's fellow inmates, however, have averred that he was unable to stand during count before his death.  (Aff. of Darius Gray, Doc. No. 53-3, ¶ 17; Aff. of Reggie Johnson, Doc. No. 53-2, ¶ 14; Aff. of Joshua Reeves, Doc. No. 53-14, ¶ 24.)

At the time of Mr. Kindell's death on August 21, 2020, the nation was enduring the COVID-19 pandemic.  Although Defendants generally knew the signs and symptoms of COVID-19, they were not

---

[2] Officer Floyd was not asked about Mr. Kindell specifically.

medical staff.³ (Pls.' Resp. to Defs.' St. of Material Facts ¶ 22.) Further, Defendants had no control over the classification or the housing assignment of an inmate. (Id. ¶ 17.) Although there was a dormitory at WCF for those at high risk for COVID, the medical department assigned inmates there based on a medical determination that the inmate was vulnerable. (Id. ¶ 18.) That said, there were COVID-19 inmates in other dormitories to include 8M-4. (Johnson Aff. ¶ 8; Gray Aff. ¶ 8.)

Defendant Officers were only trained to administer CPR and first aid, and they would call the medical department if an inmate alerted them to a health concern or otherwise needed medical attention. (Id. ¶ 22.) In instances where an inmate was unable to ask for medical attention for himself, they would contact the medical department on the person's behalf. (Id. ¶ 23.)

Inmates are seen by the medical department for screening upon intake at the facility and may have regular appointments scheduled if they are assigned to the Chronic Care Clinic, a monitoring program for inmates with chronic conditions such as hypertension or asthma. (Id. ¶ 29.) When Mr. Kindell was assessed by the medical department upon intake in 2019, at which time he weighed approximately 500 pounds, medical personnel noted that he had

---

³ The Defendant Officers generally testified that other than being instructed to wear gloves, masks and goggles when entering a dormitory, they had no other COVID training by their employer. (Davis Dep. at 11; Floyd Dep. at 17; Mobley Dep. at 21-22; Wicker Dep. at 17; see Wise Dep. 17-19.)

hypertension, dyslipidemia, anemia, and morbid obesity. (Id. ¶¶ 31 & 32.) Thus, Mr. Kindell was assigned to the Chronic Care Clinic. (Id. ¶ 33.) Mr. Kindell was counseled by the medical staff on the importance of losing weight through a healthy diet and exercise, yet he continued to order junk food from the commissary. (Id. ¶ 38.) He also admitted to taking his prescribed medication irregularly or not at all. (Id. ¶ 37.) Moreover, Mr. Kindell refused to submit to lab work to monitor his conditions on four occasions, most recently on May 12, 2020, when he refused an EKG. (Id. ¶ 40.)

Besides the chronic care appointments, an inmate could request medical attention by submitting a health services request, by asking the medical staff at pill call, or by asking a staff member to call the medical department for them. (Id. ¶ 28.) Mr. Kindell sought medical attention for himself only once on May 6, 2020, when he submitted a health services request for a broken tooth. (Id. ¶ 41.) Thus, while Mr. Kindell was seen by the medical department several times from May 2019 to his death, his last visit as recorded in the medical records was June 2, 2020, approximately 2 months before his death. (Id. ¶¶ 34, 43.) At this appointment, Mr. Kindell weighed 549 lbs. (Id. ¶ 39.)

On the day of Mr. Kindell's death, August 21, 2020, Inmate Kelly Hickson approached Officer Wise, who was stationed in the control room, and knocked on the window to get her attention. (Id. ¶ 44.) Inmate Hickson told Officer Wise that Mr. Kindell was sick

5

and needed to go to the medical department. (Id. ¶ 45.) When Officer Wise went to Mr. Kindell's cell, he confirmed to her that he needed medical attention. (Id. ¶¶ 46 & 47.) Officer Wise immediately called the medical department and waited with Mr. Kindell. Medical personnel arrived in less than ten minutes. (Id. ¶¶ 48 & 49.) The parties dispute whether Mr. Kindell was able to walk to the cell door and get in the wheelchair provided or whether he needed assistance by other inmates, but this dispute is immaterial.[4] (See id. ¶ 50.)

Once Mr. Kindell was in the medical department, he complained that he had been sick for two weeks, starting with a dry cough that evolved to feeling very weak, being short of breath with limited activity, and a productive cough. (Id. ¶ 5.) At this point, Mr. Kindell's vitals were stable and his "somewhat low pulse ox . . . substantially improved with supplemental [oxygen]." (Id. ¶¶ 54 & 55.) However, when medical staff attempted to transfer him from the wheelchair to a stretcher, he experienced severe oxygen desaturation, and he collapsed. (Id. ¶ 56.) Medical staff called 911 for EMS to be dispatched. (Id. ¶ 57.) After regaining consciousness, Mr. Kindell was confused, but he was conscious and

---

[4] From the point Inmate Hickson told Officer Wise that Mr. Kindell needed medical attention, the facts and circumstances surrounding his medical treatment are not material because the only issue in the case involves the Defendant Officers' individualized subjective knowledge of Mr. Kindell's health prior to the knock on the control room window. The facts pertaining to Mr. Kindell's care are provided only to relate the full story.

6

alert.  (Id. ¶ 58.)  His oxygen levels improved with supplemental oxygen after "a period of cessation of exertion."  (Id. ¶ 59.)

Mr. Kindell's "extreme morbid obesity" made efforts to treat him very difficult.  (Id. ¶ 60.)  There was no available stretcher that would accommodate his girth and allow navigation through doorways.  (Id. ¶ 61.)  Several people had to assist getting him back into the wheelchair to take him to the dock area where the ambulance was waiting.  (Id. ¶ 62.)  It also became very difficult to get him into the ambulance.  (Id. ¶ 63.)  As Mr. Kindell's caretakers were coaching him to assist them in getting him into the ambulance, breathing became increasingly more difficult and he became unresponsive.  (Id. ¶¶ 64 & 65.)  Despite the best efforts of medical personnel, Mr. Kindell died.  (Id. ¶¶ 67, 68, 70-72.)

The medical director reported that Mr. Kindell had been infected with COVID-19 "leading likely to hypoxia from pneumonitis and/or viral pneumonitis, and given extreme morbid obesity had very low physiological reserves and very rapidly developed carbon dioxide retention, acidosis, carbon dioxide narcosis, and then respiratory arrest."  (Id. ¶ 73.)  He further noted that "possible [congestive heart failure], [pulmonary embolism], or cardiac event may have been contributory."  (Id. ¶ 74.)  Finally, he concluded by stating that Mr. Kindell's "morbid obesity caused inordinate delays or rendered usual steps to be taken nearly impossible." (Id. ¶ 75.)  Postmortem testing indicated that Mr. Kindell's

7

respiratory and cardiac arrest were consequences of a COVID-19 infection. (Id. ¶ 76.)

Defendants in the case all claim that they were not aware that Mr. Kindell was ill prior to Inmate Hickson notifying Officer Wise on August 21, 2020. Each Defendant Officer testified that she did not know Mr. Kindell was sick before the day that he died. (Davis Dep. at 17; Floyd Dep. at 22-24; Mobley Dep. at 28, 36; Wicker Dep. at 23; Wise Dep. at 28-29, 31.) Inmate Hickson similarly testified that he had no reason to believe that any Defendant Officer knew Mr. Kindell was sick before his last day. (Dep. of Kelly O-Neil Hickson, Doc. No. 46-17, at 31, 46.)

For their part, Plaintiffs have submitted the following evidence to demonstrate the Defendant Officers' knowledge of Mr. Kindell's bout with COVID prior to August 21, 2020. In a sworn affidavit, Inmate Reggie Johnson averred that Mr. Kindell was "exceptionally sick" and had been sick for two weeks prior to his death. (Johnson Aff. ¶¶ 9-10.) He explained that correctional officers generally rushed in and out of the dormitory without addressing Mr. Kindell's failure to stand during count. (Id. ¶¶ 14-16.) He recalled that these officers included Defendants Mobley and Davis. (Id. ¶ 17.) He stated that Mr. Kindell had been unable to shower and thus, "anyone passing him . . . would have been able to smell that he had not been bathing himself." (Id. ¶ 19.) Finally, he related that he and other inmates had to "physically assist" Mr. Kindell outside to the yard because he could not stand

up and that Officers Mobley and Davis were present to see this. (Id. ¶¶ 21-23.) Inmate Darius Gray averred that Mr. Kindell was "bed-ridden and exceptionally sick" for about a week prior to his death and that he could not stand up or care for himself. (Gray Aff. ¶ 14.) He stated: "It was obvious to anyone who interacted with [Mr. Kindell] that he was very sick and in need of medical attention based on his symptoms, especially where he could not stand up and remained passed out in bed." (Id. ¶ 20.) He similarly noted that he helped Mr. Kindell out into the yard, which was witnessed by "corrections officers." (Id. ¶¶ 23-24.) He related that the staff placed food trays at the front of the dormitory for inmates to pick up, but Mr. Kindell was unable to do so and was therefore not eating. (Id. ¶¶ 26-28.) He explained that "correctional staff did not stop to interact with [Mr. Kindell] or anyone else in the dorm." (Id. ¶ 29.) Finally, Inmate Joshua Reeves averred: "It was clear to everyone, including other inmates and correctional staff that a handful of individuals were exceptionally sick and vulnerable, including [Mr. Kindell.]" (Reeves Aff. ¶ 12.) Mr. Kindell was unable to get up or eat, estimating that he was bed-ridden for a week before his death. (Id. ¶¶ 14, 21.) He explained that he and other inmates regularly told correctional staff that they needed to do something about the sick inmates. (Id. ¶ 15.)

On this factual basis, Plaintiffs contend that a jury issue exists with respect to Count I, a claim of deliberate indifference

9

under 42 U.S.C. § 1983 against the individual Defendant Officers. Defendants move for summary judgment.[5]

## II.  STANDARD OF REVIEW

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322—24 (1986).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party.  Id. at 252; accord Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012) (per curiam).  Additionally, the party opposing summary judgment "may

---

[5] Count II was dismissed by Order of April 27, 2023. (Doc. No. 23.) Count III is a state law claim of gross negligence under O.C.G.A. §§ 51-1-13 and 51-16-2.  Count IV is a claim for attorney's fees under O.C.G.A. § 13-6-11.

not rest upon the mere allegations or denials in its pleadings. Rather, [his] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576–77 (11th Cir. 1990). As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [Plaintiff's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (internal quotation marks omitted).

The Clerk gave Plaintiffs notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 47.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The matter has been fully briefed and is ripe for adjudication.

### III. LEGAL ANALYSIS

Section 1983 creates a private right of action for the deprivation of federal rights by persons acting under color of state law. 42 U.S.C. § 1983. In this case, Plaintiffs claim that the Defendant Officers violated Mr. Kindell's constitutional right to be free from cruel and unusual punishment under the Eighth

11

Amendment.  As originally noted in the seminal case of Estelle v. Gamble, 429 U.S. 97, 104-05 (1976), prison officials may be held liable to inmates under the Eighth Amendment if they are "deliberately indifferent" to their "serious medical needs."  In Farmer v. Brennan, 511 U.S. 825, 834 (1994), the Supreme Court clarified that in order to be deliberately indifferent, a prison official must have a "sufficiently culpable state of mind."  Thus, deliberate indifference has a subjective component, inquiring into the *mens rea* of a defendant.

Earlier this year, the Eleventh Circuit Court of Appeals, sitting *en banc*, clarified that the correct *mens rea* standard for all deliberate indifference cases is "subjective recklessness as used in the criminal law."  Wade v. McDade, 106 F.4th 1251, 1254 (11th Cir. 2024) (quoting Farmer, 511 U.S. at 839).  To meet this standard, a plaintiff must show that the defendant "actually knew that [her] conduct–[her] own acts or omissions-put the plaintiff at substantial risk of serious harm." Id. at 1253.  The Wade court added that if a defendant responds reasonably to a risk, even a known risk, she cannot be found liable under the Eighth Amendment. Id. at 1253, 1262.  Given this criminal recklessness standard, it remains that inadvertence or negligence, even gross negligence, in providing adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain."'"  See Farrow v. West,

320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Estelle, 429 U.S. at 105-06).

In this case, the Defendant Officers contend that Plaintiffs have no evidence that any one of them actually knew Mr. Kindell was "exceptionally sick" (as described by his fellow inmates) and thus required medical attention prior to the day of his death. The issue then is whether Plaintiffs' evidence, predominantly garnered from the affidavits of three inmate witnesses, presents a jury question as to whether any individual Defendant was subjectively aware of the decedent's serious risk of death from COVID-19 yet recklessly disregarded that risk. Upon review of this evidence, the Court finds and concludes that there is no jury issue.

In the relevant record evidence, only two Defendants' names are even mentioned therein, Officers Davis and Mobley. The Court particularly notes that Officer Wicker last worked in the same dormitory as Mr. Kindell at best two weeks prior to his death. Accordingly, it is undisputed that she was not in position to know of his serious medical need because his condition began only as a dry cough two weeks prior to his death. (Pls.' Resp. to Defs.' St. of Material Facts ¶¶ 5 &8.) Unquestionably, Officer Wicker cannot be held liable for deliberate indifference under these undisputed facts.

13

As for the other Defendant Officers, Plaintiffs point to the following aspects of Mr. Kindell's behavior to demonstrate that the Officers were on notice of his illness and the risk of serious harm: the assistance he needed going out into the yard; his failure to stand as required during some of the counts; his failure to bathe; his shortness of breath; his failure to eat; and his failure to get out of bed in the days leading up to his death. All three fellow inmates testified that it was clear and obvious to anyone that interacted with Mr. Kindell that he was sick. Yet, Inmate Gray observed that the "guards would quickly enter the dormitory to do 'the count.'" (Gray Aff. ¶ 15.) Inmate Johnson similarly stated that "[c]orrectional staff during this time generally rushed in and out of the dorm without addressing [Mr. Kindell's] behavior." (Johnson Aff. ¶ 16.) In fact, Inmate Johnson names Officers Davis and Mobley as the staff members who hurriedly "rushed" in and out of the dormitory. (Id. ¶ 17.) Based on this testimony, it is difficult to reach Plaintiffs' factual conclusion in brief that the Defendant Officers "repeatedly interacted with Mr. Kindell." (Pls.' Resp. in Opp'n, Doc. No. 53, at 52.) More significantly, however, there is a lack of evidence of any individualized interaction with Mr. Kindell. The only fact of record that specifically names an officer is Inmate Johnson's statement that Officers Davis and Mobley were present when he and

other inmates "physically assisted" Mr. Kindell out into the yard. (See id. ¶¶ 21-23.)  It would be unreasonable to conclude that this fact, even if true, shows Officers Davis and Mobley knew that Mr. Kindell required medical attention or would suffer serious harm.

What Plaintiffs' evidence comes down to is that if the Defendant Officers had interacted with Mr. Kindell on a daily basis, they **should have known** that he was so ill as to be at serious risk of harm. The Eleventh Circuit in Wade, however, emphasized that deliberate indifference for purposes of liability under the Eighth Amendment requires a plaintiff "to prove that the defendant prison official *actually knew* of a substantial risk of serious harm, not just that [s]he *should have known*." 106 F.4th at 1257 (emphasis in original).  Further, in discussing what it is to "actually know" of a substantial risk of serious harm, the Wade court explained that "generalized awareness of a medical need . . . is not enough."  Id. at 1258 (quoted source omitted).  Rather, the defendant prison official must be aware that her action or inaction (e.g., failure to get medical attention) will "put the [inmate] at substantial risk of harm." Id.  Thus, in this case, Plaintiffs must show that each Defendant Officer individually knew of Mr. Kindell's illness and that their failure to get him medical attention would cause him serious harm.  Here, Plaintiffs contend

15

that the Defendant Officers "received relevant training about the dangers posed by COVID-19, symptoms of it, and the risks associated with it, including to individuals with serious pre-existing conditions - such as morbid obesity." (Pls.' Resp. in Opp'n at 52.) Yet, the record does not bear out this contention because the Defendant Officers were not medical staff and did not receive any particularized COVID-19 training. (See n.3, *supra*.)

In short, the record evidence, even when viewed in the light most favorable to Plaintiffs, fails to show that any individual Defendant Officer knew of Mr. Kindell's illness and that failure to obtain medical attention would cause a serious risk of harm to him. That they (as a collective group) *should have known* from generalized observation that Mr. Kindell was ill and needed medical attention is not enough to establish liability as a matter of law. Without evidence of an individual officer's subjective awareness, Plaintiffs have failed to create a triable jury issue on whether any Defendant Officer was deliberately indifferent to Mr. Kindell's medical circumstances.

### IV.   CONCLUSION

Upon the foregoing, the Court **GRANTS** Defendants' motion for summary judgment as to the remaining federal claim, Plaintiffs' claim of deliberate indifference in Count I. (Doc. No. 46.) The

16

Court declines to exercise supplemental jurisdiction over Plaintiffs' state law tort claim in Count III or the derivative claim for attorney's fees in Count IV. See 28 U.S.C. § 1367(c).

The Clerk is directed to **ENTER JUDGMENT** in the case as follows:

> As to Plaintiffs' deliberate indifference claim under 42 U.S.C. § 1983 (Count I), Defendants Qiana Mobley, Christy Davis, Vanessa Wise, Shaniqua Wicker, and Amberlyn Floyd are entitled to summary judgment. Plaintiffs' state law tort claim (Count III) and derivative claim for attorney's fees (Count IV) as against these same Defendants are dismissed without prejudice because the Court declines to exercise its supplemental jurisdiction.

Plaintiffs are directed to notify the Court within ten (10) days whether they intend to pursue their federal claim of deliberate indifference against Defendant Tashika McKinnon.

**ORDER ENTERED** at Augusta, Georgia, this 9th day of October, 2024.

UNITED STATES DISTRICT JUDGE